UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

|  |  |  |
|---|---|---|
| THE ESTATES OF BRIAN LEE MILLS, and OF CHRISTAL MILLS, Betty Reynolds, Administratrix, | ) ) ) ) | Civil No: 11-208-GFVT |
| Plaintiff, | ) ) ) | |
| V. | ) ) | **MEMORANDUM OPINION & ORDER** |
| KNOX COUNTY, et al., | ) ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court upon the Motion for Summary Judgment filed by

Defendants Knox County; Knox County Jail (a/k/a Knox County Detention Center); J.M.

Hall, individually and in his official capacity as Knox County Judge Executive; and Mary

Hammons, individually and in her official capacity as Knox County Jailer.  This case

involves multiple defendants, but because these four defendants filed the instant motion

separately from the other defendants, the Court will address it separately from the other

defendants' motions.  For the reasons explained below, the motion for summary

judgment is GRANTED as to these four defendants.

**I**

**A**

This litigation is the result of an arrest and detention that occurred on the evening

of July 30, 2010, in Barbourville, Kentucky.  On that evening, Brian Mills and Jessica

Hubbard were involved in a minor car accident. [R. 31 at 1.] When the other driver called the police, Mills and Hubbard swallowed a number of Roxicet tablets that they had obtained illegally, hoping to avoid drug charges. [*Id.*; R. 66 (Hubbard Depo.) at 42-50.][1] Barbourville Police Officers Jake Knuckles and Pat Clouse arrived on the scene of the accident, in response to the call by the other driver. [R. 31-1.] Mills admitted to the officers that he had recently smoked marijuana but did not tell them about the other drugs he had ingested. [R. 31 at 2; R. 31-1.] The officers administered field sobriety tests, which Mills failed. [R. 31-1.] Officer Knuckles arrested Mills and took him to the hospital for a blood test, which Mills refused to take, and then took Mills to the Knox County Detention Center. [R. 31 at 2; R. 31-1.]

A second-shift deputy jailer, Shelby Johnson, booked Mills upon his arrival at the Detention Center. [R. 31 at 2.] The third shift deputy jailers relieved Deputy Johnson at 11:00 p.m., and at least two of them continued working until the first shift came on duty at 7:00 a.m. on July 31. [*Id.*; R. 53 (Johnson Depo.) at 13-14; R. 51 (Levering Depo.) at 51.] At about 7:45 a.m. on July 31, an inmate trustee told the deputy jailers on duty at the booking desk that Mills was unresponsive.[2] [R. 31 at 2; R. 65 (Foley Depo.) at 9-10.] Upon receiving that information, Deputy Jailers Bill Mills and Michael Potter went to Mills' cell and found him unresponsive, not breathing, and without a pulse. [R. 31 at 2] They called EMS and attempted to perform CPR until the ambulance arrived. [*Id.*] The ambulance transported Mills to the hospital where he was pronounced dead. [*Id.*] The

---

[1] The parties refer several times to various depositions in support of their factual summary, but the parties have not attached those depositions to their motions. The depositions were filed in the record as separate documents, and some of them are missing several pages. The Court only cites to the parties' briefs or to the documents actually filed in the record in the factual summary included here.

[2] For much of the information in this paragraph, the Court can only cite to Defendants' brief because several of the depositions Defendants cite in support have never been filed in the record. The parties, however, do not dispute these facts.

cause of death was declared to be multiple drug overdose from alprazolam, marijuana, and oxycodone, all found in Mills' system. [*Id.*; R. 31-3.] Betty Reynolds is the Administratrix of the Estates of both Brian Mills and his wife Christal Mills, and in that capacity, Reynolds has filed the instant suit on their behalf.[3]

The parties do not dispute the facts related above, but the Estate's responsive brief contains additional facts related below, which Defendants do not dispute. The Knox County Jail has a Policy and Procedures Manual ("the Manual") that instructs deputy jailers to take inmates in physical distress to the hospital, and also instructs deputy jailers to check on each inmate once every hour and keep a log of such checks. [R. 52 at 2; R. 49 (Hammons Depo.) at 16-22.] This Manual was apparently in effect when Brian Mills died. [R. 49 at 7.] According to Mills' Estate, the Manual also requires checks of inmates in detoxification cells every twenty minutes.[4] [R. 52 at 3.]

Deputy jailers in Knox County must take a sixteen-hour training course every year [R. 49 (Hammons Depo.) at 18], but Thomas Levering, a deputy jailer who was on duty during the third shift when Mills died, testified that he does not remember the training course covering how often deputy jailers should check on inmates, nor did he remember being instructed to read the Manual. [R. 52 at 2; R. 51 (Levering Depo.) at 15-17, 20.] Levering also testified that it was common practice to check on inmates in the detoxification cell once every hour unless they were "unsteady on their feet" or

---

[3] Mills' wife Christal initially brought suit, but she also died of a drug overdose shortly after Brian's death.

[4] Mills' Estate cites to portions of this Manual in the responsive brief, but did not attach a copy of those pages (or any other part of the Manual) for the Court to see. The deposition testimonies describe the relevant portions of the Manual, however, and the Court therefore cites to the parties' briefs and the relevant depositions when discussing the Manual. Defendants do not dispute the Manual's contents.

"staggering," in which case the deputies were supposed to check every fifteen minutes. [R. 51 (Levering Depo.) at 30, 50-51.]

Joey Adler, another deputy jailer, testified that the Jail was typically overcrowded, and that on the night Mills died, there were between fifty and sixty inmates in the Jail, despite the fact that the Jail's capacity was only thirty-eight beds. [R. 50 (Adler Depo.) at 24-25.] Adler testified that on the morning Mills died, Adler left work early at 3:00 a.m. and was not replaced, leaving Levering as the only male guard on duty to check on over fifty inmates. [*Id*. at 18-19.] Adler also testified that the Jail has a copy of the Manual, parts of which he has read at work when he is bored, but that no one ever told him he needed to read through it. [*Id*. at 16-17.] Adler agreed that the Manual states inmates in detoxification areas should be checked every fifteen minutes, and he testified that inmates who were "extremely intoxicated," such as those who failed field sobriety tests should also be checked every fifteen minutes like the inmates on suicide watch.[5] [*Id*. at 47-49.]

The parties also reference a cell check form with the names of the inmates in the jail on July 30 and July 31, 2010. The form apparently records check marks beside Mills' name for every hour between midnight and 7:00 a.m.[6] [R. 52 at 3.] Levering testified that the cell check form indicates that the guards checked on Mills every hour by looking through a small hole in the door. [R. 51 (Levering Depo.) at 39, 41.] Mills' Estate

---

[5] The Estate's recitation of the facts also includes an assertion that Adler testified inmates in the "detox cell" fell under "Regular Surveillance" in the Manual which only required a check once each hour [*see* R. 52 at 5], but the pages of Adler's deposition cited in support of that statement are missing from the deposition filed in the record.

[6] Mills' Estate indicates this form was attached as an exhibit to Levering's deposition, but it is not attached to any deposition filed in the record. To the Court's knowledge, the Estate never filed the cell check form in the record until February 19, 2014, in response to a different motion filed by different defendants. Both Levering's and Adler's deposition testimonies refer to and describe this form in significant detail, however, and the Court therefore cites to the briefs and to the relevant depositions as needed.

claims that the cell check form also includes unexplained check marks beside the name of another inmate, Bo McVey, for several hours before McVey was ever incarcerated in the jail. [R. 52 at 3.] Deputy Jailers Levering and Adler could not explain the check marks beside McVey's name, and Mills' Estate seems to imply that this indicates that the cell check sheets are sometimes filled out after the fact. [R. 51 at 43-46; R. 50 at 36-37.] Deputy Levering, however, denied any knowledge of such a practice. [R. 51 at 43-46.]

The Jail also had a video system with a camera trained on the hallway outside the detoxification cell where Mills was detained, and that camera captured video footage of two deputy jailers removing Mills' body from the cell and performing CPR on the morning in question. [R. 52 at 3-4.] Curiously, however, Mills' Estate alleges that all video footage of the previous eight hours from that camera, which would confirm whether the guards checked on Mills as required, is missing and cannot be located by Jail personnel. [R. 52 at 3-4.] The Estate has asserted that the missing video footage amounts to spoliation of evidence that would demonstrate that deputy jailers did not perform the cell checks as required by the Manual. [R. 52 at 8.] The factual recitation contained in the Estate's responsive brief also contains several other alleged facts which neither party incorporates into their arguments or ever refers to again, and the Court therefore deems them irrelevant to include here.

**B**

Betty Reynolds, on behalf of Brian Mills' Estate, filed suit in this Court on July 27, 2011. [R. 1.] The initial Complaint named the following defendants: Knox County; Knox County Jail (a/k/a Knox County Detention Center); J.M. Hall, individually and in his official capacity as Knox County Judge Executive; Mary Hammons, individually and

in her official capacity as Knox County Jailer; Bill Mills, individually and in his official capacity as Knox County Deputy Jailer; and the "Yet Unknown or as Yet to be Identified employees or officers of Knox County Jail." [R. 1.] The initial Complaint contained four counts, including claims brought under 42 U.S.C. §1983, alleging that Defendants had violated Mills' rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution; a related claim alleging a failure to properly train or supervise employees; and a state law claim for negligence. [R. 1.]

On March 27, 2013, Reynolds filed an Amended Complaint on behalf of Mills' Estate. The Amended Complaint added five new Defendants individually and in their official capacities as Deputy Jailers for Knox County, and six new defendants individually and in their official capacities as Magistrates of Knox County Fiscal Court. [R. 22-1.] Bill Mills was terminated as a party defendant and is no longer a party to this suit. The Amended Complaint included six counts. The counts relevant to the Defendants who have filed the instant motion for summary judgment are as follows: Counts One and Two allege violations of the Fourteenth and Eighth Amendments to the Constitution by depriving Mills of his liberty, acting with deliberate indifference to his rights, and acting in a manner constituting cruel and unusual punishment. [R. 22-1 at ¶¶ 34-43.] Count Three alleges a failure to adequately train employees of Knox County Jail. [*Id*. at ¶¶ 44-49.] Count Four asserts several causes of action under state law for wrongful death, negligence, false imprisonment, and arbitrary action. [*Id*. at ¶¶ 50-54.] Count Five alleges that four of the new defendants were deliberately indifferent to Mills' constitutional rights, in violation of 42 U.S.C §1983. [*Id*. at ¶¶ 55-58.] Count Six requests declaratory and injunctive relief pursuant to 28 U.S.C. § 2201. [*Id*. at ¶¶ 59-61.]

The Amended Complaint excluded Hammons in her official capacity from the allegations in Counts One, Two, and Three, but particularly included Hammons in her official capacity in Count Six.

Defendants Hall, Hammons, Knox County, and Knox County Jail have filed the instant motion for summary judgment on all claims against them [R. 31], and thus only the claims pertaining to those Defendants will be addressed here. Those claims include the alleged violations of Mills' rights under the Fourteenth and Eighth Amendments, the alleged failure to train, and the causes of action brought under state law.

## II

### A

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of

material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

In applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Liberty Lobby*, 477 U.S. at 255). However, the trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id*.

**B**

The primary claim brought by Mills' Estate concerns an alleged violation of his Constitutional rights. Such allegations, as well as allegations concerning a failure to train, are properly brought under 42 U.S.C. §1983. Section 1983 does not create substantive rights but, rather, "provides a remedy for deprivations of rights secured by the

Constitution and laws of the United States. . . ." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 924 (1982); *Mertik v. Blalock*, 983 F.2d 1353, 1359 (6th Cir. 1993). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Graham v. Connor,* 490 U.S. 386, 394 (1989) (additional citations omitted)).

In specifying the constitutional rights at issue, it is necessary to clarify that Mills was a pretrial detainee at the time of his death, and therefore his Constitutional claims are properly analyzed under the Fourteenth Amendment rather than the Eighth Amendment. The Eighth Amendment applies to those who are incarcerated after conviction, and thus does not apply in this context. *Graham v Connor*, 490 U.S. 386 (1977). However, both the Sixth Circuit and the United States Supreme Court have found that the Fourteenth Amendment's due process clause affords pretrial detainees "a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners." *Harbin v. City of Detroit*, 147 F. App'x 566, 569 (6th Cir. 2005) (citing *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003)). Whether the claim is brought under the Eighth or Fourteenth Amendment, "[w]here prison [or jail] officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment . . . ." *Vaughn v. City of Lebanon*, 18 F. App'x 252, 272 (6th Cir. 2001) (quoting another source). Consequently, Mills' claim concerning deliberate indifference to his medical needs is properly brought under the

Fourteenth Amendment, but is analyzed under the same standards employed in evaluating Eighth Amendment claims concerning cruel and unusual punishment.[7] *Bell v. Wolfish*, 441 U.S. 520, 535, 545 (1979); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001).

## C

In the Estate's response to the motion for summary judgment, the Estate concedes several of its claims and agrees to dismiss certain Defendants. It is therefore necessary to clarify which claims may be dismissed by agreement of the parties, and which claims still require adjudication by the Court.

First, the parties agree that Knox County Jail is not a legal entity capable of being sued, and that Knox County is the proper defendant in this matter. [R. 52 at 5-6.] The Amended Complaint also does not name Knox County Jail as a defendant, and Mills' Estate does not object to Knox County's dismissal. [R. 52 at 6.] Accordingly, all claims against Knox County Jail (a/k/a/ Detention Center) are dismissed.

Second, Mills' Estate does not object to the dismissal of the state law claims brought against Hall and Hammons officials in their official capacities. [R. 52 at 6.] Defendants argue, and Mills' Estate agrees, that Kentucky counties are protected from the state law claims by sovereign immunity, and that state law claims brought against county officials in their representative capacities are the same as if they were brought against the county. *See Comair, Inc. v. Lexington-Fayette Urban County Airport Corp.*, 295 S.W.3d 91, 94-95 (Ky. 2009). Mills' Estate also concedes that Knox County is entitled to sovereign immunity from liability under state law. [R. 52 at 6.] Accordingly, Knox

---

[7] The Estate's responsive brief concedes this point. [*See* R. 52 at 7 n.2.]

County, and both Hammons and Hall in their *official* capacities are entitled to summary judgment on all of the *state* law claims against them.

Third, Defendant Hammons effectively argues that persons sued in their individual capacities under §1983 may only be held liable based on their personal behavior in violating someone's constitutional rights. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642 (6th Cir. 2012). Because Hammons did not become Knox County Jailer until after Brian Mills' death, she had no personal involvement in the events that gave rise to his death. Mills' Estate therefore concedes that the claims against Mary Hammons in her individual capacity should be dismissed. Accordingly, all constitutional *and* state law claims brought against Mary Hammons in her *individual* capacity are hereby dismissed.

Finally, Mills' Estate concedes that the claims in Count IV, Paragraph 50 of the Amended Complaint for money damages for violations of the Kentucky Constitution should be dismissed as to all Defendants. [R. 52 at 6-7.] Those claims relating to the Kentucky Constitution are therefore dismissed as to *all* Defendants in this case.

Thus, the only claims related to the instant motion remaining for the Court to adjudicate are the constitutional claims brought against Mary Hammons and J.M. Hall in their official capacities; the constitutional claims against J.M. Hall in his individual capacity; and the state law claims brought against J.M. Hall in his individual capacity.

### III

### A

First, the charges related to the §1983 claim brought against Hammons and Hall in their official capacities are functionally equivalent to charges brought against Knox

County because "[i]ndividuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing *Graham*, 473 U.S. at 165). This is because a plaintiff seeking to "recover on a damages judgment in an official-capacity suit must look to the government entity itself" to pay the damages. *Graham*, 473 U.S. at 166. Thus, the constitutional claims brought against Hammons and Hall in their official capacities as Knox County Jailer and Knox County Judge Executive are subject to the same analysis as the federal claims against Knox County, and the Court will consider all of them together. *See Essex v. Cnty. of Livingston*, 518 Fed. Appx. 351, 354 (6th Cir. 2013) ("[A]n official-capacity claim is merely another name for a claim against the municipality."); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity.").

Like Knox County, neither Hall nor Hammons as county officials can be held liable under §1983, even for a failure to train or supervise, unless the allegedly unconstitutional action is a result of an unconstitutional "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the local governing body's] officers," or through an informally adopted governmental custom. *Johnson v. Hardin Cnty., Ky.,* 908 F.2d 1280, 1285 (6th Cir. 1990) (quoting *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 690–91 (1978) (internal quotation marks omitted)). Hall and Hammons also cannot be liable under §1983 on the basis of *respondeat superior* liability. *See Monell*, 436 U.S. at 691. Instead, they can only be liable under §1983 if "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id*. Thus, Mills' Estate must establish both that Mills' constitutional rights were violated *and*

that a policy or custom of Knox County was the "moving force" behind the violation of his rights. *Bozung v. Rawson*, 439 Fed. Appx. 513, 521 (6th Cir. 2011) (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir. 2010)).

The first problem in meeting this standard is that Mills' Estate has not presented evidence to clearly establish a violation of Mills' constitutional rights. Before the Court can determine whether the policies of Knox County Jail deprived Mills of his rights, there must be some evidence that a constitutional violation actually occurred. The Amended Complaint specifically alleges that the Defendants' actions in failing to ensure that Mills received adequate medical attention for his drug overdose amounted to a deprivation of Mills' liberty interests without due process, and that this failure to provide medical attention amounted to cruel and unusual punishment. [R. 25 at ¶¶ 34-43.] As explained above, to sustain this cause of action, the plaintiff "must establish that the defendants acted with 'deliberate indifference to serious medical needs.'" *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm . . . . It is not enough that there was a danger of which an officer should have been aware . . . ." *Id*. (citing *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994)). The officer must actually have known of the risk and disregarded it in order to violate either the Eighth or Fourteenth Amendments. *Id*. Moreover, the medical needs must "arise from an injury or illness so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899-900 (6th Cir. 2005) (internal quotations omitted).

In light of that standard, Mills' Estate has not produced evidence that anyone knew Mills was at risk of harm from a drug overdose. The jail employees knew that Mills had smoked marijuana, but the evidence produced thus far does not show that they actually knew, or even suspected, that he had swallowed other pills, or that he was in any serious danger. Thus, the jail personnel could not have knowingly disregarded a risk to his health. The Sixth Circuit in *Watkins* considered a similar case of a pretrial detainee who died of a drug overdose while in custody. *Watkins*, 273 F.3d at 682. There, the court found that it was "not enough for plaintiff to demonstrate a question of fact whether the police officers or sheriff's deputies *should have known* that Watkins had swallowed drugs." *Id*. at 686. The court particularly notes that Watkins had not told the officers that he had swallowed any drugs even when they asked him, and that Watkins did not request medical treatment. *Id*. Because the officers did not actually know he needed treatment, they did not violate his constitutional rights. *Id*. Similarly, Mills did not tell anyone he had swallowed other drugs, nor did he request medical treatment. Thus, as in *Watkins*, Mills' Estate has not established that anyone involved knew of Mills' medical needs or exhibited a deliberate indifference to his needs such that a deprivation of his constitutional rights occurred. "If the individual defendants have violated no constitutional right, the municipality cannot be liable under §1983 for a failure to train." *Cooper v. Cnty. of Washtenaw*, 222 Fed. Appx. 459, 473 (6th Cir. 2007).

Assuming, however, for the sake of argument that Mills' constitutional rights were in fact violated, in order for Hall or Hammons to be liable in their official capacities, the Estate must next establish that a policy or custom of Knox County was the "moving force" behind the violation. *Bozung*, 439 Fed. Appx. at 521. In support of this

argument, the Estate's responsive brief primarily focuses on the allegations for failure to train and/or supervise brought against Hall and Hammons as county officials. To prevail on such a claim, the plaintiff must prove the following three things: "that the training program at issue is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is closely related to or actually caused the plaintiff's injury." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992) (internal quotations omitted) (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989); *City of Canton*, *Ohio v. Harris*, 489 U.S. 379, 388 (1989)); *see also Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

In support of its claim, Mills' Estate points to the county's Policies and Procedure Manual for the jail which states that jail personnel must conduct "in-person surveillance a minimum of every twenty (20) minutes" for all "inmates in detoxification areas." [R. 52 at 8.] According to the Estate, because two deputies testified that the accepted practice was to check on inmates in the detox cell only once an hour, "it is clear that the failure to train the deputy jailers in the correct procedure set out in the Manual was the moving force" behind the alleged constitutional deprivation of Mills' rights. [R. 52 at 8.] Mills' Estate further assumes that the deputy jailers did not even perform a cell check once each hour, but instead checked the marks on the form after the fact. The only basis for this assumption the Estate offers are the marks by McVey's name before he was actually booked and the missing video surveillance tapes which the Estate claims constitute spoliation of evidence.[8] [R. 52 at 8.] The Estate also assumes that if Mills' cell actually

---

[8] Again, Mills' Estate has not attached a copy of the Manual or the cell check form to its brief.

had been checked every twenty minutes, as prescribed in the Manual, his death "could likely have been prevented." [*Id.*]

For the first required element, an inquiry regarding the inadequacy of the training "must extend beyond the question of whether the individual officers involved were poorly trained." *Cooper*, 222 Fed. Appx. at 473. The proper inquiry is "whether such inadequate training can justifiably be said to represent 'city policy.'" *City of Canton*, 489 U.S. at 390. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice" on the part of city policymakers" can the failure be properly thought of as a city policy "that is actionable under §1983." *Id*. at 389 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986)). Here, Mills' Estate presents no evidence about the training program for jail employees, but only about the requirements of the Manual. Instead of pointing to a particular deficiency in the training program, the Estate merely assumes that the training must have been inadequate because two deputies said they customarily checked on inmates in the detoxification cell only once an hour instead of every twenty minutes.[9] [R. 52 at 8.] Apart from further evidence of the actual training program, the deputy jailers' testimony about practices of checking on inmates may reflect more on the administration of the jail and the actions of individual deputies rather than on the training program itself. Even in the sole case which Mills' Estate relies on concerning this issue, the Supreme Court explained it is not enough "to prove that an injury or accident could

---

[9] Even the support for this contention is somewhat lacking. First, Deputy Levering's testimony does not unambiguously state that it was jail policy to never check on inmates in the detox area more than once an hour, as Mills' Estate implies. [*See* R. 51 at 50-51.] Levering testified that it was the practice to check on them once each hour unless they were "staggering around a lot" in which case they were checked every fifteen minutes. [*Id.*] Deputy Adler also testified that detainees who were "extremely intoxicated" were checked on every fifteen minutes in the detoxification areas were put by themselves and checked on every fifteen minutes. [R. 50 at 46-47.] It is also unclear whether Adler meant that the inmates who needed to be checked on more frequently were actually put in the detox area where Mills was held or if they were put elsewhere. [R. 50 at 48-49.] Finally, the other portion of Adler's testimony that Mills' Estate relies on [*see* R. 52 at 5] is missing from the record.

have been avoided if an officer had had better or more training. . . ." *City of Canton*, 489 U.S. at 391.  The fact that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id*. at 390-91 (internal citations omitted).  Such liability will not attach where "an otherwise sound program has occasionally been negligently administered," or where "an injury or accident could have been avoided if an officer had had better or more training." *Id*. at 391.

Second, the standard for whether an alleged failure to train amounts to an unconstitutional policy still requires an element of deliberateness.  Unsupported allegations concerning inadequacy of the training or the potential negligence of employees will not suffice.  *See City of Canton*, 489 U.S. at 389-90.  Liability of a city, a county, or county officials under §1983 on a theory of failure to train may only be imposed "where such failure to train amounts to deliberate indifference toward a detainee's serious needs for medical care." *Blackmore*, 390 F.3d at 900; *see also City of Canton*, 489 U.S. at 389 (explaining that only when the failure to train employees evidences such a "deliberate indifference" to citizens' constitutional rights can the failure be considered a "policy or custom that is actionable under §1983") (internal quotation marks omitted).  This "deliberate indifference" can be shown by "proof that the city or county 'knows that inmates face a substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it.'" *Blackmore*, 390 F.3d at 900 (quoting *Farmer*, 511 U.S. at 847).  One way of demonstrating such indifference "is where the city fails to act in response to the repeated complaints of constitutional violations by its officers." *Cherrington v. Skeeter,* 344 F.3d 631, 646 (6th Cir. 2003).  A second way

involves "a failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction." *Id.* (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).

Here, Mills' Estate has not presented any factual evidence of deliberate indifference on the part of Knox County or its policymakers. Indeed, the only contention the Estate offers in support of its claim is the fact that two deputies appeared unfamiliar with the Manual's instructions concerning how often they should check on inmates in the detoxification cell [R. 52 at 8], but this allegation alone is insufficient to establish the required factors explained above. Mills' Estate has not provided evidence of a failure on the part of Knox County, Hall, or Hammons, to respond to repeated complaints of constitutional violations. *See Cherrington*, 344 F.3d at 646. Nor has the Estate shown that Hall or Hammons knew or should have known of any failure in training that would foreseeably result in Mills' death. *See Cherrington*, 344 F.3d at 646.

Moreover, even if Adler's testimony about the cell checks could demonstrate that deputy jailers are inadequately trained in monitoring detainees in the detox cell, local governments, or local government officials sued in their official capacities, "are responsible only for their own illegal acts," and "are not vicariously liable under §1983 for their employees' actions." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (internal citations and quotation marks omitted). For §1983 liability to attach to Hall and Hammons in their official capacities, the Estate must prove that the failure to check on Mills (if there was indeed such a failure) was an "action pursuant to official municipal policy." *Monell*, 436 U.S. at 691. Once again, only a showing of deliberate indifference to the rights of people with whom the employees come into contact can be properly

thought of as a "policy or custom that is actionable under §1983." *Id.* (quoting *City of Canton*, 489 U.S. at 389). This kind of deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Cnty. Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 403, (1997). As the Supreme Court has recently explained:

> [*w*]*hen city policymakers are on actual or constructive notice* that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent *if the policymakers choose to retain that program*. The city's 'policy of inaction' in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution. A less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities. . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick*, 131 S. Ct. at 1360 (internal citations and quotation marks omitted) (emphasis added); *see also Pembaur,* 475 U.S. at 483, (opinion of Brennan, J.) ("[M]unicipal liability under §1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials...").[10]

Here, Mills' Estate fails to meet this stringent standard. Even if Adler and Levering believed they did not need to check on inmates in the detox cell more than once per hour, Mills' Estate has not demonstrated that such a deviation from the Manual

---

[10] The Court notes that both *Connick* and *Canton* leave open the possibility that there may be circumstances in which a need for training is so obvious that local officials could be considered to have been deliberately indifferent even without a pattern of constitutional violations that would put them on notice of the deficiency, *see Connick*, 131 S. Ct. at 1361; *Canton*, 489 U.S. at 390, but such is not the case here since there has been no evidence or even argument concerning obvious deficiencies in the actual training program currently in place for deputies of Knox County Jail. Mills' Estate alleges no facts whatsoever about the deputies' training program or even supervision -- the Estate merely assumes it must be deficient because at least two deputies did not follow the Manual and indicated that confusion might exist about how often prisoners in the detox cell must be checked. Such assumptions are too conclusory to meet the stringent standard for liability in this case.

resulted from a decision of Knox County lawmakers, or that it was a practice " so persistent and widespread as to practically have the force of law." *Connick*, 131 S. Ct. at 1359. Nor has the Estate presented any evidence even suggesting that Hall, Hammons, or any other Knox County administrator were on "actual or constructive notice" that any deputies were not following the Manual properly, nor is there evidence to show that any policymakers continued to adhere to an inadequate training program in light of such knowledge.[11] *See id.* at 1360; *Bryan Cty.*, 520 U.S. at 407. Apart from such demonstrations, neither Knox County, nor Hall and Hammons in their official capacities, can be liable under §1983 for a failure to train.

The standard of §1983 liability for a county or city "will not be satisfied by merely alleging that the existing training program for a class of employees, . . . represents a policy for which the city is responsible." *City of Canton*, 489 U.S. at 389. Even if deputies Adler and Levering did not follow the policy properly, municipal liability under §1983 cannot attach simply because "one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on *respondeat superior*." *Id.* at 387. Accordingly, summary judgment will be entered in favor of Knox County, and in favor of both Hall and Hammons in their official capacities.

## B

The Estate's §1983 claims against Hall in his individual capacity also fail. An official sued in his individual capacity can only be held personally liable under §1983 if he was personally involved in the alleged deprivation of the plaintiff's rights. Mills'

---

[11] Hammons in particular could not have known that the Manual was not being followed since she did not even become Knox County Jailer until after Mills' death, a point which Mills' Estate readily concedes. [R. 52 at 2; R. 49 (Hammons Depo.) at 4-5, 16-17.]

Estate attempts to place liability on Hall in his individual capacity based on the fact that he is the Judge Executive of Knox County, and that as such, he was the head of the Fiscal Court and had the responsibility of assuring adequate training for jail employees.  [R. 52 at 9-10.]  The Estate further asserts that the Fiscal Court adopted the policies governing the jail which included the Manual, and that the Fiscal Court delegated responsibility for implementing those polices to the Jailer.  [R. 52 at 10.]  Mills' Estate also claims that Hall improperly abdicated his responsibility to the Jailer, thus allowing unconstitutional behavior to become the custom in Knox County Jail.  [*Id*.]  Based on Hall's role as the head of the Fiscal Court, and on his having ultimate authority over the jail, Mills' Estate argues that Hall can and should be held liable for constitutional deprivations at the jail that result from a failure to train.  [*Id*.]

Supreme Court precedent is clear that a government official such as Hall cannot be held personally liable on a theory of failure to train under a §1983 claim unless he personally "caused the deprivation of a federal right."  *Graham*, 473 U.S. at 166. Otherwise stated, "[b]ecause § 1983 liability cannot be imposed under a theory of *respondeat superior*, proof of personal involvement is required for a supervisor to incur personal liability."  *Miller*, 408 F.3d at 817 n.3 (citing *Taylor v. Mich. Dept. of Corr*., 69 F.3d 76, 80-81 (6th Cir. 1995)).  Mills' Estate, however, fails to show that Hall had any personal knowledge that deputies were not checking on inmates in the manner required by the Manual.

Instead, the Estate argues that Hall should be held personally responsible because he ultimately had the responsibility to ensure that jail employees were properly trained. However, personal liability for Hall "cannot be based solely on the right to control

employees." *Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir. 1993). "When a plaintiff seeks to hold someone individually liable for constitutional injury directly caused by someone else, the court must apply standards regarding supervisory liability." *Clark v. Kentucky*, 229 F. Supp. 2d 718, 723 (E.D. Ky. 2002) (citing *Doe, ex rel. Doe. v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002). In cases where the supervisor is also the policy-maker, which has been implied in this case, for individual liability to attach on a failure-to-train or supervise theory, the defendant "must be found to have 'encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Essex*, 518 Fed. Appx. at 355 (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008). Even if the defendant did not directly encourage the offending behavior, the plaintiff must demonstrate that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id*.

Here, despite Hall's position as Judge Executive, Mills' Estate has presented no evidence that Hall knew that jail personnel did not understand or did not follow the Manual's instructions on checking inmates in the detox cell every twenty minutes, much less that he *encouraged* them to disregard the Manual. Mills' Estate also has not demonstrated that Hall "at least implicitly authorized, approved, or knowingly acquiesced" in any practice of jail deputies disregarding the Manual's instructions. Apart from such evidence, Hall cannot be held personally liable under §1983 for a failure to train or supervise, and the Court will grant summary judgment to Hall on those claims.

## D

The Estate's remaining state law claims include wrongful death, negligence, and false imprisonment brought against Hall in his individual capacity. These claims fail on

the merits and because no genuine dispute exists concerning them.  To successfully bring a claim for wrongful death under Kentucky law, Mills' Estate must show that Mills' death resulted "from an injury inflicted by the negligence or wrongful act of another," but damages for the death may only be recovered "from the person who caused it."  KRS §411.130(1).  Because there is no evidence that Hall knew Mills or the circumstances surrounding his detention, the Estate cannot establish that Hall caused Mills' death. Mills' Estate also has not established that Hall committed a negligent or wrongful act that caused Mills' death.  To bring a claim for negligence, the Estate must establish that Hall breached a duty of care he owed to Mills that arose out of a special relationship giving rise to that duty.  *City of Florence, Kentucky v. Chipman*, 38 S.W.3d 387, 393 (Ky. 2001).  Hall asserts that he did not have a special relationship with Mills because he did not have any personal responsibility for oversight at the Knox County Detention Center and he was not involved in any of the facts that gave rise to Mills' death.  [R. 31 at 10.] Mills' Estate has not disputed this fact, and thus no genuine dispute exists as to whether Hall was personally negligent or otherwise wrongfully caused Mills' death.

For false imprisonment claims, Kentucky law requires the same analysis as for false arrest claims.  *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007).  For both claims, the plaintiff must show that detention was unlawful by lacking legal process.  *Id*.  Here, there has been no evidence, or even an argument, that Mills was unlawfully confined.  Mills' Estate has not argued that legal justification for detaining Mills was lacking, and also has not argued that Hall had any role in detaining Mills.  Thus, any claim against Hall for false imprisonment necessarily fails.

Moreover, as explained above, once the moving party's burden shifts, the nonmoving party "must do more than show there is some metaphysical doubt" about a material fact. *Hall Holding*, 285 F.3d at 424. Here, Mills' Estate has not disputed Hall's position on any of the state law claims, and thus has not met its burden to present triable issues of fact preventing a grant of summary judgment in Hall's favor.[12]

## IV

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

(1)     Defendants' Motion for Summary Judgment [**R. 31**] is **GRANTED** for all claims brought against **Knox County**;

(2)     Defendants' Motion for Summary Judgment [**R. 31**] is **GRANTED** for all claims against **Knox County Jail (a/k/a Detention Center)**;

(3)     Defendants' Motion for Summary Judgment [**R. 31**] is **GRANTED** for all federal **and** state law claims  asserted against **Mary Hammons** and **J.M. Hall** in their **official** capacities;

(4)      Defendants' Motion for Summary Judgment [**R. 31**] is **GRANTED** for all federal and state law claims asserted against **Mary Hammons** in her **individual** capacity;

(5)      Defendants' Motion for Summary Judgment [**R. 31**] is **GRANTED** for all federal **and** state law claims asserted against **J.M. Hall** in his **individual** capacity;

(6)     Plaintiff's claims for money damages arising under the Kentucky Constitution in Count IV of the Amended Complaint are **DISMISSED as to ALL Defendants**, pursuant to agreement between the parties;

---

[12] Hall would likely be shielded from all the state law claims based on Kentucky's qualified immunity standard as well, but because neither party has presented any arguments concerning qualified immunity, the Court will not address it here.  *See Yanero v. Davis*, 65 S.W.3d 510, 521-22 (Ky. 2001).

(7)     The Plaintiff's claim for declaratory and injunctive relief, pursuant to 28 U.S.C. §2201, is premised on Plaintiff's §1983 claims, and because no violation of §1983 has been found with regard to Mary Hammons or J.M. Hall, such relief with regard to these Defendants is unnecessary and inappropriate;

(8)     Defendants **Knox County; Knox County Jail; Mary Hammons**, **both individually and in her official capacity** as Jailer of Knox County Jail/Knox County Detention Center; and **J.M. Hall**, **both individually and in his official capacity** as Knox County Judge Executive, are hereby **DISMISSED** from this action; and

(9)     This is a **FINAL** and **APPEALABLE ORDER** and there is no just cause for delay.

(10)    The Court will enter an appropriate judgment contemporaneously herewith.

This 14th day of March, 2014.

Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**